**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUNG JAE HYUNG, Derivatively on Behalf of DOCGO, INC.<br><br>Plaintiff,<br><br>v.<br><br>LEE BIENSTOCK, STAN VASHOVSKY, MICHAEL BURDIEK, STEVEN KATZ, VINA LEITE, IRA SMEDRA, ELY D. TENDLER, JAMES M. TRAVERS, ANTHONY CAPONE, ANDRE OBERHOLZER, and NORMAN ROSENBERG,<br><br>Defendants,<br><br>and,<br><br>DOCGO, INC.,<br><br>Nominal Defendant. | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jung Jae Hyung ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of DocGo, Inc. ("DocGo" or the "Company"), submits this Verified Amended Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record as well as from a review of internal Company documents produced to Plaintiff and Plaintiff's Counsel pursuant to 8 *Del. C.* § 220. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein

after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of law that have caused substantial harm to the Company.

2. DocGo specializes in offering mobile health and medical transportation solutions to numerous healthcare providers across the United States and the United Kingdom. Leveraging its unique technology platform, the Company aims to deliver its services in partnership with premier healthcare organizations. These collaborations are designed for the long term, with the goal of generating substantial revenue, facilitating efficient and effective capital investment, and fostering opportunities for significant growth with minimal risk.

3. In November 2022, DocGo announced that Defendant Anthony Capone ("Capone") would take over as Chief Executive Officer ("CEO"), succeeding Stan Vashovsky ("Vashovsky"), starting January 1, 2023. A press release about the executive change included a statement from Vashovsky, highlighting, "[w]e are extremely fortunate to have someone with [Defendant Capone's] skill set and track record to take the reigns as CEO next year, and I have every confidence in the continued growth and success of this company."

4. In the spring of 2023, New York City became the destination for several thousand international migrants in search of employment and/or asylum. In reaction to this influx, Mayor Eric Adams ("Mayor Adams") of New York City initiated a new strategy aimed at relocating these migrants beyond the confines of the city's five boroughs. To manage this relocation initiative, the city granted DocGo with a no-bid contract valued at $432 million ("HPD Contract"), which commenced in early May 2023. The agreement mandated that DocGo accommodate the migrants

and furnish a range of services including case management, medical care, food, transportation, lodging, and continuous security.

5. Following this, however, *The New York Times* ("NYT") reported on DocGo's initial efforts to relocate migrants in New York City, describing the process as troubled. According to the report, asylum seekers voiced complaints about intimidation and "broken promises" following the city's decision to grant DocGo the HPD Contract. The article highlighted concerns from local authorities regarding the absence of effective collaboration between DocGo and other agencies capable of offering services to migrants. It was noted that "[l]ocal authorities have expressed frustration at the lack of coordination between DocGo and agencies that could provide services to the migrants; local security guards hired by DocGo have repeatedly threatened the migrants; and finding steady work has been nearly impossible[.]" The value of DocGo's $432 million contract is almost equivalent to the company's total revenue for the year 2022, which was approximately $441 million.

6. Subsequently, on August 22, 2023, *The Albany Times Union* reported that the New York Attorney General ("AG") initiated an investigation into DocGo, advising the Company to stop restricting the speech or movement of migrants. The AG's Civil Rights Bureau dispatched a letter to DocGo's legal team, outlining "serious concerns" about possible breaches of state and federal legislation in the administration of the HPD Contract.

7. On September 6, 2023, New York City Comptroller Brad Lander ("Comptroller Lander") announced his decision not to approve the HPD Contract, citing "numerous outstanding concerns" in a letter addressed to the Department of Housing & Preservation Development ("HPD") Commissioner Adolfo Carrión Jr. These concerns included, "[i]nsufficient budget detail to justify over $432 million in contract value," "[i]nconclusive reasoning as to the selection of the

vendor and contradictory statements about their fiscal ability to provide contracted services," "[i]nadequate vendor responsibility determination, contract oversight and subsequent questions about proper service delivery," and "[i]nadequate information regarding the selection of subcontractors." Mayor Adams had the authority to move forward with the HPD Contract, which he ultimately chose to do.

8. On September 14, 2023, *The Albany Times Union* released a report indicating that Defendant Capone had fabricated aspects of his professional biography, particularly his educational background. The next day, September 15, 2023, DocGo announced Capone's departure as CEO through a filing with the SEC.

9. On September 18, 2023, Comptroller Lander declared that his office would begin an immediate audit of the operations and expenses associated with DocGo under the HPD Contract. He specifically mentioned having, "serious concerns about the selection of this vendor and its performance of contract duties."

10. Before the public was informed of the foregoing, Defendants Bienstock, Capone, Oberholzer, Tender, and Travers (collectively "Insider Trading Defendants"), sold over 434,000 shares for over $4 million while in possession of material non-public information. Further, the Individual Defendants caused the Company to repurchase over 500,000 shares of its own common stock at artificially inflated prices while in possession of this material, non-public information.

11. Following the wrongdoing alleged herein, and following an inspection of internal books and records produced pursuant to 8 *Del. C.* § 220, Plaintiff served a litigation demand (the "Demand") on the Company's Board of Directors (the "Board"), requesting that the Board "investigate and commence legal proceedings against … former and/or current directors, executive officers and agents of the Company" to remedy the harm caused to the Company.

12. However, at the time of filing this complaint, the Board has failed to acknowledge or respond to the Demand. For the reasons set forth herein, the Board's decision to ignore Plaintiff's Demand constitutes a wrongful and willful refusal of the Demand and cannot be the product of prudent business judgment nor in the Company's best interests.

## JURISDICTION

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has subject-matter jurisdiction pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.§240.10b-5, promulgated thereunder by the SEC.

14. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants

have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through being listed on the stock exchange in this District and issuing false statements in this District.

17. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

18. ***Plaintiff*** is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff is a citizen of South Korea.

### Nominal Defendant

19. ***Nominal Defendant DocGo*** is incorporated under the laws of the State of Delaware and its principal executive offices are located at 685 Third Avenue, New York, NY 10017. DocGo's common stock trades on the NASDAQ under the ticker symbol "DCGO."

### Director Defendants

20. ***Defendant Stan Vashovsky*** ("Vashovsky") served as the Company's CEO until January 2023. Defendant Vashovsky was also Chairman of the Board and served as a Company director from November 2021 until March 31, 2024. Upon information and belief, Defendant Vashovsky is a citizen of New York.

21. ***Defendant Lee Bienstock*** ("Bienstock") served as the Company's President and Chief Operating Officer ("COO") until September 2023 and has served as the Company's CEO and director since September 2023. Upon information and belief, Defendant Bienstock is a citizen of New York.

22. ***Defendant Michael Burdiek*** ("Burdiek") has served as a Company director since November 2021. Upon information and belief, Defendant Burdiek is a citizen of California.

23. ***Defendant Steven Katz*** ("Katz") has served as a Company director from November 2021 until October 1, 2024 and served as the Company's Lead Independent Director from April 2023 until October 1, 2024. Upon information and belief, Defendant Katz is a citizen of New Jersey.

24. ***Defendant Vina Leite*** ("Leite") has served as a Company director since November 2022. Upon information and belief, Defendant Leite is a citizen of Arizona.

25. ***Defendant Ira Smedra*** ("Smedra") has served as a Company director since November 2021. Upon information and belief, Defendant Smedra is a citizen of California.

26. ***Defendant Ely D. Tendler*** ("Tendler") has served as a Company director since November 2021. Upon information and belief, Defendant Tendler is a citizen of New York.

27. ***Defendant James M. Travers*** ("Travers") has served as a Company director since November 2021. Upon information and belief, Defendant Travers is a citizen of Florida.

28. The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

29. ***Defendant Anthony Capone*** ("Capone") served as the Company's CEO from January 2023 until September 2023. Upon information and belief, Defendant Capone is a citizen of New York.

30. ***Defendant Andre Oberholzer*** ("Oberholzer") served as the Company's Chief Financial Officer ("CFO") until January 2023. Upon information and belief, Defendant Oberholzer is a citizen of New York.

31. ***Defendant Norman Rosenberg*** ("Rosenberg") has served as the Company's CFO since January 2023. Upon information and belief, Defendant Rosenberg is a citizen of New York.

32. Defendants Capone, Oberholzer, Rosenberg, along with Defendants Bienstock and Vashovsky are collectively referred to herein as the "Officer Defendants."

33. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

34. DocGo provides mobile medical and transportation services in the United States and the United Kingdom. Its suite of services includes mobile health services, virtual care management, and ambulance services. In its 2022 Annual Report, the Company boasts that it "provide[s] [its] services in collaboration with leading healthcare organizations via long-term relationships that are intended to drive meaningful revenue, help provide efficient and effective capital allocation and create low-risk opportunities for significant growth.

35. DocGo began as Motion Acquisition Corp. ("Motion"), a blank check company formed by business executives in the transportation software and technology sector. A blank check company is sometimes referred to as a special purpose acquisition company, or "SPAC," and does not initially have any operations or business of its own. Rather, it raises money from investors in

an initial public offering ("IPO") and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.

36. Motion completed its IPO on October 19, 2020. Motion's business objective, as stated in its IPO offering documents, was "to identify, acquire and operate a business in the telematics industry," an interdisciplinary field encompassing telecommunications, vehicular technologies, electrical engineering, and computer science.

37. On January 6, 2021, Motion signed a letter of intent to combine with Ambulnz, which was then a private company. On March 9, 2021, Motion and Ambulnz announced they had entered into the Business Combination agreement on March 8, 2021. On October 14, 2021, Motion filed with the SEC a final proxy for the merger recommending shareholders vote in favor of the Business Combination (the "Proxy"). On November 2, 2021, Motion shareholders approved the Business Combination.

38. On November 5, 2021, Motion and Ambulnz issued a release announcing the completion of the Business Combination. Ambulnz was merged with and into a subsidiary of Motion, with Motion as the surviving entity, and Motion's named changed to DocGo Inc. Motion also assumed the business and operations of Ambulnz, allowing Ambulnz to become publicly traded as DocGo.

39. DocGo had two business segments: Transportation Services and Mobile Health. DocGo's Transportation Services segment provided emergency response and nonemergency transportation services offered under the Ambulnz brand (a wholly-owned subsidiary of DocGo after the Business Combination). DocGo's Mobile Health segment provided healthcare at home and offices, testing, vaccinations, and event services, including onsite healthcare support at

sporting events and concerts. The Company's mobile health services included onsite evaluation, diagnostics, triage, and treatment.

## THE MISCONDUCT

40. This action is concerned with two instances of underlying misconduct which has caused harm to the Company. ***First***, Defendant Capone actively misrepresented his educational background, purporting to have a master's degree which he never had. Yet, the remaining Individual Defendants allowed Capone to lead the Company without ever investigating his educational background. ***Second***, the Individual Defendants issued, or caused the Company to issue, misleading information regarding the Company's operational performance and outlook, particularly as it related to the HPD Contract.

### Defendant Capone's Education

41. DocGo promoted itself as a technology company positioned at the intersection of healthcare and technology. According to Capone: "DocGo, when you look at its heart, is really a technology company. From day one when we built the company, that was going to be our focus." Critical to DocGo's messaging on technology was AI.

42. While DocGo was promoting itself as a technology company, AI experience and capabilities were increasingly being recognized as important differentiators, particularly for high growth and startup companies. According to a September 27, 2021 Harvard Business Review article titled: "AI Adoption Skyrocketed Over the Last 18 Months," startups were "targeting established industries by employing the latest data-driven technologies to enter new markets with new solutions." And growth in the AI healthcare market was projected to skyrocket. As noted in a July 11, 2023 IBM.com article titled: "How can artificial intelligence benefit healthcare?" the AI healthcare market, "valued at $11 billion in 2021, is projected to be worth $187 billion in 2030.

That massive increase means we will likely continue to see considerable changes in how medical providers, hospitals, pharmaceutical and biotechnology companies, and others in the healthcare industry operate."

43. At the same time, many companies were finding it hard to attract employees with necessary AI experience. According to a McKinsey article titled: "The state of AI in 2022 – and a half decade in review":

> Unfortunately, the tech talent shortage shows no sign of easing, threatening to slow that shift for some companies. A majority of respondents report difficulty in hiring for each AI-related role in the past year, and most say it either wasn't any easier or was more difficult to acquire this talent than in years past. AI data scientists remain particularly scarce, with the largest share of respondents rating data scientist as a role that has been difficult to fill . . . .

44. Against this backdrop, DocGo sought to capitalize on the growing AI wave. DocGo's "technology backbone" purportedly was a proprietary central AI system that managed the logistics behind DocGo's scheduling, patient interactions, and resource allocation. Based on the Company's representations, analysts believed DocGo's AI technology platform to be the Company's largest differentiator in ambulance services and mobile health. Needham & Company, which covered DocGo, described DocGo's proprietary AI platform as the Company's "secret sauce." On June 21, 2023 Canaccord Genuity, which also covered DocGo, wrote: "To be clear, the technology platform is the largest differentiator for DocGo with management emphatically defining itself as a technology company." On August 18, 2023, BTIG LLC ("BTIG"), which also covered DocGo, wrote:

> DCGO's underlying advanced proprietary technology is the core of the company and drives DCGO's value. Its platform is also the key differentiator that gives it an edge over competitors.

* * *

> DCGO has framed itself as a tech company that is at the cross-section between healthcare and technology.

45. Critical to the Company's purported technology platform were Capone and his education in AI. [redacted] Following this, Capone climbed the ranks of DocGo and was appointed CEO following Vashovsky's retirement, effective December 31, 2022. In a press release announcing his retirement on November 7, 2022, Vashovsky commented that "[w]e are very fortunate to have someone with Anthony's skill set and track record to take the reigns as CEO next year…"

46. Early into his role as DocGo's CEO, on March 15, 2023, at an Oppenheimer Healthcare Conference, Capone specifically linked DocGo's "technology backbone" to his personal background:

> Now, again, the whole piece that we have is on top of our technology backbone. That technology backbone allows for the procurement, the dispatching, the automation of our services. And to emphasize again, DocGo's technology is at the same level [a]s the best technology companies in the world. Although we are a services company where we deliver, we derive nearly all of our revenue from services, clinical services provided in the field. The technology that we have is of the same caliber of some of the true technology companies that sell technology, that is what they make their money from.
>
> Part of that's due to the fact that that's my background. That's kind of where I'm heavily weighted towards. And so, every solution – every problem that we have, we answer with a technology solution. We deploy code [to] production six to seven times every single day, millions and millions of lines of code doing highly sophisticated AI-based solutions that do all the routing, the dispatching, and the predictive analytics to know who you dispatch to, where, and why.

47. Indeed, Capone repeatedly highlighted his purported graduate degree in computational learning theory to investors, customers, and the public in an effort to boost DocGo's prospects and capabilities.

48. On June 16, 2021, Vashovsky and Capone submitted a "Proposal to the New Jersey Department of Health Office of the Commissioner (the "Proposal") on behalf of Ambulnz, DocGo's medical transportation subsidiary. The Proposal included Capone's résumé, which stated that Capone had earned a Masters of Computational Learning Theory from Clarkson University in May 2014. The Proposal also represented Capone had earned a Bachelor of Science in Computer Science, a Bachelor of Arts in Philosophy, and a Bachelor of Arts in Law – each "Sum Cum Laude" – from SUNY Potsdam in May 2009:

**EDUCATIONAL EXPERIENCE**

**Masters of Computational Learning Theory -** Clarkson University - May 2014
**Bachelor of Science (CS)** – SUNY College at Potsdam, Graduated Sum Cum Laude - May 2009
**Bachelor of Arts (Philosophy) -** SUNY College at Potsdam, Graduated Sum Cum Laude - May 2009
**Bachelor of Arts (Law) -** SUNY College at Potsdam, Graduated Sum Cum Laude - May 2009
**Dale Carnegie School of Business Communication -** Graduated August 2005

49. Capone frequently highlighted his supposed academic pedigree when speaking to investors, expressly connecting his advanced degree in AI to the foundational strengths of the Company. For example, on September 13, 2022, while President of DocGo, Capone stated at an H.C. Wainwright Global Investment Conference:

> So Stan [Vashovsky] came in. Clinical background: paramedic for 28 years, had been in health care for almost that entire time. My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer. ***My graduate degree is in computational learning theory, which was a subset of artificial intelligence***. And so we brought those two together. We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.[1]

---

1 Unless otherwise noted, all emphasis herein is added.

50. The next day, on September 14, 2022, at a Morgan Stanley Global Healthcare Conference, Capone again emphasized his graduate degree in computational learning theory to investors:

> My name is Anthony Capone, currently the President at DocGo. Originally, when we formed the company, I was our Chief Technology Officer. That's kind of where my background is in. ***My grad degree is in computational learning theory, which is a discrete subset of computer science, artificial intelligence***.

51. On November 7, 2022, DocGo issued a release announcing Vashovsky was retiring as CEO. DocGo's Board appointed Capone as CEO, effective January 1, 2023. In the release, Vashovsky stated:

> "I am extremely proud of what we have been able to accomplish as a company these past seven years, introducing an entirely novel way of delivering quality care that is beneficial to both patients and payers alike. We are very fortunate to have someone with Anthony's skill set and track record to take the reigns [sic] as CEO next year, and I have every confidence in the continued growth and success of this company."

52. However, at no time before appointing Capone as CEO did Vashovsky or the rest of DocGo's Board bother to verify the accuracy of Capone's educational credentials.

53. After the Board appointed Capone as CEO, Capone continued to tout his credentials in the rapidly expanding field of AI to investors. For example, on January 12, 2023, at a JPMorgan Healthcare Conference, Capone stated:

> My name is Anthony Capone, as introduced there. I'm Chief Executive Officer. We started the company about 6.5 years ago; I was our Chief Technology Officer***. My background, my grad degree is in computational learning theory, which is a subset of AI.*** So I'm on the technology side. And as I'll go through, our founder is on the clinical side, and we bring the two together to deliver a true, true healthcare service that's built on top of very sophisticated technology backbone.

54. Later in the same presentation at the JPMorgan Healthcare Conference, Capone again touted his academic credentials:

> Now one of the key parts, and I like to talk about this quite a lot because it's my background, ***my graduate degree is in computational learning theory, is our technology.*** Everybody says they have technology. Everybody has got some app that they like to have. This is not that.

55. Capone also repeatedly inserted references to his credentials into messaging about the AI capabilities of DocGo. On August 9, 2023, at a Canaccord Genuity Growth Conference, Capone stated:

> We started the company. I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

56. Unbeknownst to investors, however, Capone had not earned a graduate degree in computational learning theory or any other field of study from Clarkson University or any other institution. In fact, Capone had never even enrolled in any graduate program at Clarkson University. Nor had Capone earned a triple summa cum laude undergraduate degree from SUNY Potsdam. On September 14, 2023, *The Albany Times Union* published an article titled: "DocGo CEO Anthony Capone admits he didn't earn graduate degree." In the article, Capone admitted he had never earned any master's degree and refused to confirm that he even held an undergraduate degree from SUNY Potsdam, let alone a triple *summa cum laude* degree, as he had previously represented:

> This week, the Times Union found another discrepancy involving DocGo: Anthony Capone has said he went to the State University of New York at Potsdam for his undergraduate degree, according to his biography on the company's website.
>
> Capone's biography also says he received a graduate degree in artificial intelligence from Clarkson University, which has a campus in Potsdam. But a spokesman for Clarkson University said the school has no record of Anthony Capone enrolling in or completing a graduate degree at the university.

> Late Thursday, Capone responded through his spokesman and admitted in a statement the information is false.
>
> "I want to address a serious issue concerning incorrect information about my educational background. Specifically, it has come to my attention that my public biography erroneously states that I hold a [master]'s degree from Clarkson University," Capone said. "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution. This inaccuracy should have been corrected, and I deeply apologize for this error. I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."
>
> Capone added that he takes "full responsibility and am making immediate corrections to all official bios, profiles, and any other materials where this incorrect information appears."

57. Amazingly, Capone's admission that he had fabricated parts of his résumé was itself false and misleading as it suggested only that his "public biography" was erroneous when in fact Capone had systematically lied about his education time and again to investors, customers, and the public. The next day, on September 15, 2023, DocGo filed a Current Report on Form 8-K with the SEC, announcing Capone's "resignation."

58. Internal documents reveal that, on September 15, 2023, [redacted]

**<u>DocGo's Performance and Prospects</u>**

59. Though DocGo originated as Ambulnz, with a focus on medical transportation, the Company's Mobile Health segment grew dramatically through 2020, 2021, and 2022. DocGo reported Mobile Health revenues of $234.4 million in 2021 and $325.9 million in 2022. By the first quarter of 2023, the Mobile Health segment comprised over 69% of the Company's business.

60. Within DocGo's Mobile Health segment, the Company had a number of different segments, or "verticals," including governments, payers, hospitals, and events. DocGo's government vertical was the Company's largest by a significant margin. As Capone stated at a March 7, 2023 Cowen Health Care Conference: "Our government vertical is the largest. That's over 60% of our revenue. And that's what we call population health. So we go to large municipalities. These are very large contracts when you win them."

61. The growth in DocGo's Mobile Health segment and government vertical had been aided by a surge in COVID-19 testing and other services related to COVID-19. For example, during the pandemic, municipalities and municipal healthcare systems such as New York City and NYC Health + Hospitals engaged DocGo to provide COVID-19 testing and vaccinations for the homeless population. With the pandemic winding down in late 2022 and early 2023, DocGo sought to transition its Mobile Health division away from a COVID-19 testing-centric business to cover a wider range of population health services. One way DocGo sought to do this was by seeking government contract opportunities by responding to Requests for Proposals ("RFPs").

62. Multiple statements regarding DocGo's RFP process and DocGo's growing ability to pursue larger and more lucrative government contracts were made. For example, on January 12, 2023, Capone described "extreme acceleration" in DocGo's RFP channel at a JPMorgan Healthcare Conference:

> When we look into 2023 . . . the biggest growth is probably going to come from the fact we've seen extreme acceleration in our RFP channel, meaning that we're

> applying for more of these government awards. We're getting better at it, and the size of the awards are getting larger and larger. They used to be in the $2 million to $10 million in annualized revenue. Now they're in the $10 million to sometimes multi-hundred million dollars in annualized revenue that we're applying for.

63. On March 13, 2023, DocGo hosted an earnings call, during which the Company announced its Q4 2022 results. Defendant Bienstock discussed DocGo's pursuit of increasingly large RFP opportunities:

> The average size, we've increased significantly. We had originally started with the size that you just mentioned, around the $10 million mark, but we've increased that substantially to $30 million to $50 million, is our average submission at this point. So we're going after larger opportunities, and we're going after more opportunities.

64. Early in May 2023, [redacted]

65. On May 8, 2023, DocGo hosted an earnings call in which it announced the Company's Q1 2023 results. Defendant Bienstock again highlighted the growth of DocGo's RFP channel:

> So the number of RFP submissions outstanding has actually doubled since we last reported that number. The total contract value has increased from $1.1 billion to $1.5 billion. So just to clarify that. We're seeing really an increase across the board from federal deals to local municipal deals. We continue to evaluate RFP opportunities across the spectrum on the government side. So, really, it has included representation from the federal opportunities as well as the local and state – municipal opportunities.

66. Analysts covering DocGo viewed DocGo's RFP efforts as a material component of the Company's future growth and upside. On April 4, 2023, Canaccord Genuity wrote: "We remain encouraged by the greater number of RFPs the company is bidding on and the increasing size of potential contract values that management has highlighted." On April 20, 2023, Cantor Fitzgerald commented that DocGo's "pace and scale of RFP bids and wins are increasing rapidly," and "[t]he pace of bids has increased to 2-3 per week from 2-3 per month, and the scale of RFPs to $10-200M+ from $2-10M." On May 9, 2023, Cantor Fitzgerald noted that DocGo's "RFP pipeline is now $1.5B, up from $1.1B in March, with the number of RFPs doubled."

67. In spring 2023, DocGo won a no-bid $432 million contract with the New York City Department of Housing Preservation and Development ("HPD") that took effect in early May 2023. The HPD contract required DocGo to house migrants and provide them with services including case management, medical care, food, transportation, lodging, and around-the-clock security. The HPD contract was awarded in connection with New York City's policy to relocate migrants outside its five boroughs, including to places such as Albany County, Erie County, and Schenectady County. The HPD contract was the largest contract DocGo had ever received from New York City (or any other state or local government) and nearly matched the Company's total reported revenue in 2022 of $440.5 million.

68. Soon after the HPD contract became effective in May 2023, reports surfaced of DocGo's disruptive behavior in the communities in which the Company had relocated migrants. On July 22, 2023, *The Times Union* reported that on the morning of July 18, 2023, hotel guests at a Super 8 in Rotterdam, New York had been abruptly cleared out of their rooms without notice before DocGo transported migrants there.

69. Then, on July 30, 2023, the NYT published an article reporting on a "rocky, at best" start to DocGo's migrant relocation efforts. The NYT article reported that migrants complained of threats and "broken promises" after New York City awarded DocGo the HPD contract. Specifically, the article stated: "Local authorities have expressed frustration at the lack of coordination between DocGo and agencies that could provide services to the migrants; local security guards hired by DocGo have repeatedly threatened the migrants; and finding steady work has been nearly impossible." The July 30, 2023 article reported that DocGo had given migrants "dubious work eligibility and residency letters on what appeared to be a fake [New York City] letterhead."

70. In August 2023, [redacted]

71. Despite internally acknowledging the associated risks, less than a week later, on August 7, 2023, DocGo convened an earnings call with investors and analysts to deliberate on the Company's third-quarter results for 2023 (denoted as the "Q3 2023 Earnings Call"), during which Capone persisted in commending the robustness of the company's offerings, including the Asylee Project. Notably, in the prepared remarks of the Q3 2023 Earnings Call, Capone made statements that, in substance, included:

> The rapid acceleration of revenue growth is driven by multiple factors, including the continued rollout of our medical transportation contract with health and hospitals, and the new mobile health contract with the housing and preservation department to provide primary care, urgent care, behavioral health, social work and other supporting services to migrant populations in New York.
>
> ***
>
> Before we turn it over to Q&A, I very briefly wanted to mention the recent New York Times article that was critical of our partnership with New York City to provide health care and basic services to migrant populations in upstate New York. Understand the core ethos of DocGo was to provide high-quality health care for those that needed the most. Oftentimes performing seemingly impossible tasks for our customers through rapid deployments in response to unprecedented events.
>
> In the early days of this migrant work, we were launching projects on extremely short timelines. All of this was to avoid families and children from sleeping on the streets without access to health care and basic necessities. Every day, DocGo saves lives, treating and transporting thousands and thousands of patients. One of the many key facts left out of the New York Times article was the latest weekly polling of over 500 migrants in our care, which shows that more than 85% of them believe they're being supported, and their needs are being met.
>
> And city officials are well aware of this program's success as exemplified last week when Mayor Adams reiterated. His confidence in our partnership during a press conference where he praised our work, describing it as a Herculean effort to help the city with the humanitarian crisis. I am tremendously proud of the work we are doing with the city and our partners upstate especially all the amazing hard work being performed by local CBOs whom we work with daily.
>
> We are all working hard to preserve these migrants' basic human dignity and help change their lives for the better. To the thousands of DocGo employees listening, over 2,000 of which are shareholders, the work you do matters. Every day, your efforts are helping some of the world's most vulnerable and helpless citizens find safety, support and a better life. You should be proud of the work you do. I certainly am.

72. On August 8, 2023, the City of Albany's political leaders, including Albany Mayor Kathy Sheehan, County Executive Dan McCoy, and New York Assembly members, convened a press conference to express serious concerns regarding DocGo's performance under the HPD contract. In his introductory remarks, the Albany County Executive Dan McCoy stated: "We need [New York City's] contractor, DocGo, to seriously improve their operations and be a better partner

to those in the community and the migrants." Assembly Member John McDonald later asked during the same press conference: "The question is: What in God's name is DocGo doing?" Mayor Sheehan stated: "We're here because we are really concerned that there is a lack of accountability with respect to the contractor that Mayor Adams and New York City has hired to do this very important work."

73. Reeling from mounting public scrutiny and negative media attention earned from DocGo's poor performance on the HPD contract, Defendant Capone sought to reassure investors about the Company's performance and future prospects. On August 9, 2023, the day after Albany leaders convened a press conference to rebuke DocGo, Defendant Capone presented at the Canaccord Genuity Growth Conference in Boston, Massachusetts. During the presentation, Defendant Capone highlighted a purported $4 billion contract in DocGo's pipeline with U.S. Customs and Border Protection ("CBP") to provide medical services for asylum seekers at the southern border, stating the HPD contract had given DocGo the credibility necessary to win it:

> But even more confidence in the existing lines of business with just New York, New York City with multiple asylum seeking programs, we did this in large part because it gave us [all] of the credibility to win the border patrol RFP, which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth. And that one allows us to treat all the asylum seekers as soon as they come across the border and that 72 hour st[i]nt, and we've been working on that for a very long time.

74. In the same conference, Defendant Capone also told investors DocGo could use the HPD contract to transition patients in DocGo's population health vertical into the Company's payer vertical by signing migrants up for New York State Medicaid through UnitedHealthcare:

> Just in the one program that I mentioned, which was part of the reason why we raised our earnings was a migrant contract, that we have with New York City. We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare.

> And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care.
>
> * * *
>
> United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost.

75. Analysts covering DocGo commented positively on Defendant Capone's stated focus of growing DocGo's payer and corporate vertical, as these verticals provided increased stability for the Company. After the August 9, 2023 Canaccord Genuity Growth Conference, on August 18, 2023 BTIG noted:

> DCGO is increasingly prioritizing its payer and corporate vertical which remains small now, making up less than 10% of revenue, but is DCGO's fastest-growing customer base. We like DCGO's shift towards health plans because they are generally well-insulated from volatility, and have large existing membership bases to tap into. We like the recurring revenue nature of plans.

76. Analysts also took notice of the CBP contract in DocGo's RFP pipeline. On August 18, 2023, BTIG repeated Capone's reference to the substantial CBP medical services contract, noting: "DCGO is in the process of bidding on a multi-billion dollar contract related to migrant services on the border."

77. Meanwhile, internally, [redacted]

[redacted] As such, the Board were well-aware of the ongoing risks facing the Company and the issue with the HPD Contract.

78. Nevertheless, Defendant Capone's statements regarding the value of the CBP contract and DocGo's ability to leverage the HPD Contract into the much larger CBP contract were also repeated in various news outlets. On September 1, 2023, *The Times Union* reported DocGo was "seeking to turn a $432 million migrant shelter contract with New York City into a $4 billion contract with [CBP] to provide health care for those crossing the border." The same day, The NYT reported DocGo "is now seeking to land a federal contract worth billions of dollars, the company's chief executive officer, Anthony Capone, recently acknowledged."

79. On September 6, 2023, the NYT repeated Defendant Capone's August 9, 2023 assertion at the Canaccord Genuity Growth Conference "that the company had pursued the $432 million city contract largely to give it enough credibility to bid on a $4 billion contract with [CBP]."

80. The purported $4 billion CBP contract would have been, by a factor of nearly ten, DocGo's largest government contract win in the Company's history. For reference, for the year ended December 31, 2022, DocGo reported total revenues of just $440.5 million. For the year ended December 31, 2021, DocGo reported total revenues of $318.7 million.

81. Unbeknownst to investors, however, Defendant Capone had falsely inflated the value of the CBP contract, which was not worth "o[ve]r $4 billion." In fact, the CBP contract was worth no more than $2 billion – half the amount Defendant Capone had led investors to believe at the Canaccord Genuity Growth Conference. On September 10, 2023, *The Times Union* published an article reporting: "[T]he five-year contract to provide medical services at the southern border for [CBP] is far below the $4 billion Capone cited in his comments to investors, according to a spokeswoman for the agency." *The Times Union* reported: "[A]ccording to multiple sources familiar with the ongoing bidding process, the border medical services contract is valued at $2 billion, up from its initial, but later contested, award to a company in October for $1 billion." Ultimately, DocGo failed to win any portion of the CBP contract.

82. Also unbeknownst to investors, Defendant Capone's statement that DocGo had "already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare" was also false. In the same September 10, 2023 article, *The Times Union* reported that a spokesperson for DocGo had walked back Defendant Capone's comments, admitting the Company "'does not enroll anyone in Medicaid programs.'" A UnitedHealthcare representative also confirmed to *The Times Union* that UnitedHealthcare did not have a contract with DocGo in New York.

83. However, internal documents reveal that [redacted]

[redacted]

84. Furthermore, [redacted]

[redacted]

85. In April 2024, [redacted]

86. Aware of the harm DocGo was facing, and in a drastic U-turn from the position management took just two months prior, management informed the Board [redacted]

[redacted]

87. [redacted]

88. [redacted]

[redacted]

89. [redacted]

> [redacted]

> [redacted]

[redacted]

90. [redacted]

[redacted]

## MATERIALLY FALSE AND MISLEADING STATEMENTS

**False Statements Regarding Capone's Background**

91. The Individual Defendants repeatedly chose to speak to investors and customers about Capone's academic credentials. Defendant Capone himself incessantly touted his nonexistent graduate degree in AI – a burgeoning field of technology that DocGo marketed to investors as the Company's largest differentiator and backbone.

92. Defendant Capone appeared on the "AI in Action" podcast, published on September 9, 2021 on YouTube. During the podcast, Defendant Capone discussed his background, stating:

> It's a long journey, I guess. Started young – I think 12, right before my 13th birthday is when my parents were I guess fortunate enough to get a coworker of theirs . . . to tutor me in ColdFusion and CFML, and after I learned a little CFML which is a for sure a little bit of a dead language now. I progressed and started building applications when I was 14, kind of for hire – little things here and there. National Independent Association of Lighting Distributors was my first account. I remember getting my first thousand dollar paycheck like it was yesterday and kept coding . . . through high school and into university and went to school, my undergrad, for computer science, and then graduate degree in computational learning theory, it's like a subset of AI.

93. On April 29, 2022, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2022 annual meeting of stockholders. Defendant Vashovsky signed the Notice of the 2022 Annual Meeting of Stockholders to which the proxy statement was attached, and the proxy statement was solicited by the entire Board. The proxy statement included biographical information for each executive officer of the Company. In the proxy statement, the Director Defendants represented as follows:

> Mr. Capone has served as our President since November 2021. He is an operational lead for our COVID-19 response across the U.S., including our work with FEMA's New York State COVID-19 deployment. Mr. Capone previously served as Amb[ul]nz's President, Chief Technology Officer and Chief Product Officer from 2017 until our Business Combination. Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. Mr. Capone also founded the largest free developer conference in the U.S., Engineers4Engineers. Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University.

94. On September 13, 2022, Defendant Capone presented at the H.C. Wainwright Global Investment Conference. During the presentation, Defendant Capone discussed his background, stating:

> So we decided right off the bat that the ability to route our own ambulances, to stack them, to create all of the technology necessary to actually handle the transportation we needed to build out. That's where I came in.
>
> So Stan came in. Clinical background: paramedic for 28 years, had been in health care for almost that entire time. My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer. My graduate degree is in computational learning theory, which was a subset of artificial intelligence. And so we brought those two together. We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.

95. The next day, on September 14, 2022, Defendant Capone presented at the Morgan Stanley Global Healthcare Conference. During his introductory remarks, Defendant Capone discussed his background, stating:

> … My name is Anthony Capone, currently the President at DocGo. Originally, when we formed the company, I was our Chief Technology Officer. That's kind of where my background is in. My grad degree is in computational learning theory, which is a discrete subset of computer science, artificial intelligence.

96. On October 19, 2022, Defendant Capone participated in one of Impetus Digital's Fireside Chats, with Impetus Digital CEO & Co-Founder Natalie Yeadon ("Yeadon"). Yeadon

introduced Defendant Capone in her introductory remarks, stating: "Anthony holds a graduate Computer Science degree in artificial intelligence from Clarkson University, as well as has over 20 years of software engineering experience." Capone, who was (virtually) present and attentive during the introduction, did not correct Yeadon. Later in the interview, Defendant Capone discussed his background, stating:

> First thing, it comes down to utilization. We built the company originally on utilization. . . . [T]he reason why most ambulance companies when you get in tend not to make any money is because of low utilization. So when you get in, you say "well what can I do?" Well you can't pay people less because they're already usually making very close to minimum wage at a lot of companies, and you can't increase your revenue per transport because that is fixed by Medicare. So the only thing you really can do to make more money as an ambulance company, is to do more – you run more trips on your shift. Well we built out our own software. It's called Dara, which entirely focuses on utilization, it's routing optimization, it really leverages that AI. It's kind of the intellectual reason I guess that I joined the company was that I had the ability to apply my academic training to a very practical circumstance of how do we have the ability to make sure the ambulances are running?

97. On November 7, 2022, DocGo filed with the SEC a Current Report on Form 8-K, reporting that Defendant Vashovsky was retiring and announcing Defendant Capone was appointed by the Board to succeed Defendant Vashovsky as CEO. Defendant Oberholzer signed the Form 8-K. In the Form 8-K, DocGo and Defendant Oberholzer represented:

> Mr. Capone, age 35, has served as the Company's President since November 2021. Mr. Capone previously held various positions at Ambulnz, Inc. between 2017 and 2021, including those of President, Chief Technology Officer and Chief Product Officer. Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University.

98. Before being named CEO and while President of the Company, Defendant Capone's DocGo biography represented:

> Anthony Capone has served Ambulnz's executive team since 2017 and now serves DocGo as president, having previously served as DocGo CTO, and CPO. Mr. Capone holds a graduate CS degree in Artificial Intelligence from Clarkson University and has over 18 years of software engineering experience. His sterling record of entrepreneurial excellence includes leading three companies from start to successful exit. In addition to his roles at DocGo, Mr. Capone is a member of the Forbes Tech Council, writing on topics at the intersection of healthcare and AI.

99. In January 2023, when Defendant Capone became CEO of DocGo, the Management section of the Company website represented as follows:

> Anthony Capone is CEO of DocGo. Mr. Capone has served DocGo in a number of roles since 2017, including president, CTO and CPO. Mr. Capone holds a graduate CS degree in Artificial Intelligence from Clarkson University and has over 18 years of software engineering experience. His sterling record of entrepreneurial excellence includes leading three companies from start to successful exit. In addition to his roles at DocGo, Mr. Capone is a member of the Forbes Tech Council, writing on topics at the intersection of healthcare and AI.

100. On January 12, 2023, Defendant Capone presented at the JPMorgan Healthcare Conference. During the presentation, Defendant Capone discussed his background, stating:

> My name is Anthony Capone, as introduced there. I'm Chief Executive Officer. We started the company about 6.5 years ago; I was our Chief Technology Officer. My background, my grad degree is in computational learning theory, which is a subset of AI. So I'm on the technology side. And as I'll go through, our founder is on the clinical side, and we bring the two together to deliver a true, true healthcare service that's built on top of very sophisticated technology backbone.

101. Later in the same JPMorgan Healthcare Conference, Defendant Capone again inserted his credentials into messaging about the Company's technology:

> Now one of the key parts, and I like to talk about this quite a lot because it's my background, my graduate degree is in computational learning theory, is our technology. Everybody says they have technology. Everybody has got some app that they like to have. This is not that.

102. On March 7, 2023, Defendant Capone presented at the Cowen Health Care Conference. During the presentation, Defendant Capone discussed his background, stating:

> We believe that fee-for-service medicine is a – I'm a software guy. My graduate degree is in computational learning theory. Sometimes I fall back to tech terms. But

> in tech, you would say that's an anti-pattern. The concept of fee-for-service medicine is flawed and should go away. It will eventually disappear in society because it does not make sense. It's a flawed – you have a perverse incentive model. So we don't believe in fee-for-service medicine and we – no material part of our business is in fee-for-service medicine.

103. On March 15, 2023, Defendant Capone presented at the Oppenheimer Healthcare Conference. During the presentation, Defendant Capone discussed his background, stating:

> When you look at the clinical delivery services that we have, it's significantly different than the way it works. DocGo, when you look at its heart, is really a technology company. From day one when we built the company, that was going to be our focus. And that's actually my background. My degree is in artificial intelligence. That's what I went to graduate school for. And from day one, we built out all of our own technology in-house, and not just technology that sometimes you say I need to have as a service company.

104. On April 26, 2023, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2023 annual meeting of stockholders. Defendant Vashovsky signed the Notice of the 2023 Annual Meeting of Stockholders to which the proxy statement was attached, and the proxy statement was solicited by the entire Board. The proxy statement included biographical information for each executive officer of the Company. In the proxy statement, the Director Defendants represented as follows:

> Mr. Capone has served as our Chief Executive Officer since January 2023. He previously served as our President from November 2021 to December 2022, during which time, he was an operational lead for our COVID-19 response across the U.S., including our work with FEMA's New York State COVID-19 deployment. Mr. Capone previously served as Amb[ul]nz's President, Chief Technology Officer and Chief Product Officer from 2017 until our Business Combination. Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. Mr. Capone also founded the largest free developer conference in the U.S., Engineers4Engineers. Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University.

105. On August 9, 2023, Defendant Capone presented at the Canaccord Genuity Growth Conference. During the presentation, Defendant Capone discussed his background, stating:

> While we can do so with high degrees of efficiency and generating good returns for the investors that have taken risks on DocGo is because of our technology, and that's where I really came in originally.
>
> We started the company. I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

106. On September 14, 2023, Capone was quoted by *The Albany Times Union* through his spokesperson, claiming that his "'public biography erroneously states that I hold a [master]'s degree from Clarkson University'":

> "I want to address a serious issue concerning incorrect information about my educational background. Specifically, it has come to my attention that my public biography erroneously states that I hold a [master]'s degree from Clarkson University," Capone said. "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution. This inaccuracy should have been corrected, and I deeply apologize for this error. I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."

107. The above-referenced statements were materially false and misleading when made. The facts, which were then known to or recklessly disregarded by the Individual Defendants were as follows: (i) Defendant Capone did not hold a graduate degree in computational learning theory from Clarkson University (or any other university) and had fabricated his educational credentials; and (ii) Defendant Capone's educational background was material to investors. Defendant Capone repeatedly emphasized the importance of his educational background, and specifically his graduate degree in computational learning theory, to the Company's technological capabilities. DocGo's

purported technological capabilities were the Company's supposed competitive advantage in the traditional ambulance services business and the stated reason the Company could adapt to meet contract requirements and provide healthcare services to underserved populations.

**False Statements Regarding the Company's Prospects**

108. On August 9, 2023, Defendant Capone presented at the Canaccord Genuity Growth Conference. During the presentation, Defendant Capone discussed the CBP contract, stating:

> But even more confidence in the existing lines of business with just New York, New York City with multiple asylum seeking programs, we did this in large part because it gave us all of the credibility to win the border patrol RFP, which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth. And that one allows us to treat all the asylum seekers as soon as they come across the border and that 72 hour st[i]nt, and we've been working on that for a very long time.

109. The statement set forth above was materially false and misleading when made. The facts, which were then known to or recklessly disregarded by the Individual Defendants, were as follows: (i) the contract with CBP was not valued at "o[ve]r $4 billion" or "$1 billion a year"; and (ii) due to DocGo's poor performance with the HPD contract, and the intense public scrutiny that had resulted and was then known to the Individual Defendants, Defendant Capone did not believe, and had no reasonable basis to believe, that the HPD contract gave DocGo "all of the credibility to win the border patrol RFP.

110. On August 9, 2023, Defendant Capone, at the same Canaccord Genuity Growth Conference presentation, discussed signing up migrants onto New York State Medicaid, stating:

> Just in the one program that I mentioned, which was part of the reason why we raised our earnings was a migrant contract, that we have with New York City. We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare.
>
> And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to

> eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care. And in that particular case, you know they're coming into the country with no primary care provider and they have no health plan. Of course they don't.
>
> * * *
>
> United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost.

111. The statements set forth above were materially false and misleading when made. The facts, which were then known to or recklessly disregarded by the Individual Defendants, were as follows: (i) DocGo did not enroll anyone, including asylum seekers, in New York State Medicaid programs, as the Company later admitted; (ii) DocGo did not have a contract with UnitedHealthcare in New York and did not have the ability to enroll asylum seekers in United Healthcare's managed care program, as later admitted; and (iii) DocGo's ability to grow its payer vertical was material to the Company's future growth and earnings.

## THE TRUTH EMERGES

112. Following the dissemination of false and misleading information, the truth was revealed from September 6, 2023 to January 10, 2024.

113. The truth began to emerge on September 6, 2023 when Comptroller Lander declined to approve the HPD Contract—the first time during his term that his office had done so regarding an emergency contract. He provided four reasons for his decision: (i) "[i]nsufficient budget detail," (ii) "[i]nconclusive reasoning as to the selection of the vendor and contradictory statements about [DocGo's] fiscal ability to provide contracted services," (iii) "[i]nadequate vendor responsibility determination, contract oversight and subsequent questions about proper

service delivery," and (iv) "inadequate information regarding the selection of subcontractors" including for security guards. On this news, DocGo's stock price fell from a closing price of $8.17 per share on September 5, 2023 to a closing price of $7.55 per share on September 6, 2023—a 7.59% decrease.

114. Then, on September 14, 2023, an *Albany Times Union* article revealed that Defendant Capone had provided false information about his educational history. The next day, Friday, September 15, 2023 at 5:26 PM—only minutes before the 5:30 cutoff for SEC filing for the weekend—the Company filed a Form 8-K with the SEC announcing Defendant Capone's resignation as CEO and "from all other positions with the Company due to personal reasons." On this news, DocGo's stock price fell from a closing price of $6.46 per share on September 14, 2023 to a closing price of $5.70 per share on September 15, 2023—an 11.76% decrease.

115. On September 18, 2023, Comptroller Lander issued a press release announcing a new real-time audit to examine the oversight of the operations and invoices incurred by DocGo under the HPD Contract:

> New York City Comptroller Brad Lander today announced he will immediately commence a first-of-its-kind audit of the oversight of the operations and invoices incurred by DocGo, Inc., the medical services company hired by the city to provide shelter services to new arrivals in the city and upstate. In a new letter sent to the Department of Housing Preservation and Development (HPD), Lander noted his office has "serious concerns about the selection of this vendor and its performance of contract duties," adding that "agencies must seek to obtain as much competition in vendor selection as is practicable" and "ensure that selected vendors have the requisite expertise and wherewithal to perform as required under the contract."
>
> Earlier this month, the office declined to approve the no-bid $432 million contract due to outstanding questions about how this vendor was selected and is performing its duties.
>
> "There are just too many outstanding questions and concerns about DocGo and this $432 million no-bid contract," said Comptroller Brad Lander. "New Yorkers deserve real-time oversight and accountability to understand how this price tag was

> reached, ensure this company has the experience to provide the contracted services, and vet the integrity and responsibility of this vendor."
>
> Lander also indicated that, due to questions surrounding the DocGo contract, his office is currently reviewing whether there is a need to revoke a 2022 prior approval authorization the Comptroller's Office granted the Administration to utilize emergency procurement rather than seek specific prior approval for each individual contract. Lander noted the prior authorization had not been intended as a blanket approval of any contract that any agency wishes to enter into, and that "after 18 months, this is no longer an unexpected situation that merits the broad suspension of due diligence processes to ensure that City funds are being spent wisely and with integrity."

116. On this news, DocGo's stock price fell from a closing price of $5.70 per share on September 15, 2023 to a closing price of $5.29 per share on September 18, 2023—a 7.19% decrease.

117. Finally, on January 10, 2024, Fuzzy Panda Research issued a report titled "DocGo – Allegations of Fraudulent Billing Practices & Forging of Documents" (the "Fuzzy Panda Report") which unveiled for the first time the full extent of the wrongdoing, including the following summary:

> - Billing practices that former employees said amounted to Medi-Cal and Medicare Fraud.
> - Lawsuits exposing multiple allegations of forging signatures on documents.
> - Billing for covid tests that were not actually performed.
> - Systematically editing patient reports to maximize profits.
> - Culture of "cover-up rather than comply" where management cover-ups of mistakes and patient care issues.
> - Terminating whistleblowers who spoke up against alleged "illegal acts" or offering payments that appear to amount to bribes.
> - Leadership has a long history of lies and connections to fraudulent schemes.
>   - o Two key people were at companies that the DOJ charged with

fraudulently over-billing the US government.

- Another's business was caught up in the unraveling of the second largest ponzi scheme in history.

- A CEO who cited his high ethics but recently resigned for lying about his resume.

- And a Board of Directors whose backgrounds include multiple pump & dumps, penny stocks, delistings, reverse mergers, and connections to large ponzi schemes.

- DocGo's corporate structure includes:

  - Variable Interest Entities (VIE) which were made infamous by Enron to hide corporate losses. We think DocGo is using their VIE to hide liabilities and losses.

  - Subsidiary going through a secretive "ABC liquidation" instead of a normal bankruptcy process.

    - Sources told us the ABC liquidation has unearthed massive liability claims of >$100 million at the subsidiary.

- Small no name auditor.

- Widely reported issues with the NYC migrant asylum contract include:

  - Abuse of and lying to migrants

  - Potential related party dealings involving renting hotels managed by the CEO's brother and owned by individuals the DOJ recently charged with fraud.

  - Wasteful spending – including throwing away $39,000 a day of food meant for migrants

- Fundamentals of the core business are subpar with low gross margins and the company will lap all the one-time revenue benefits within 5 months.

  - Est[imated] that one time revenue will decline by ~90% as DocGo already lost a majority of the year 2 NY migrant asylum contract.

- Other fundamental patient care issues we discovered include:

  - Lying to government auditors.

  - o Skipping or cheating on required certifications and trainings.

- DocGo's claims to be a tech and AI company yet:
  - o CEO resigned after lying on his resume about obtaining degrees in AI.
  - o The company's "AI subsidiary" in Estonia has only 1 full-time employee.

- Multiple government investigations have already begun into DocGo:
  - o NYC comptroller launched a real-time audit of DocGo's work and expenses[.]
  - o NY Governor's office and their Department of State launched their[] investigation.
  - o NY Attorney General's office announced an investigation[.]

118. In addition to the Fuzzy Panda Report's identification of the HPD Contract issues, the Fuzzy Panda Report contains troubling information about the officers' and directors' failure to provide mission-critical oversight to meet its self-proclaimed purpose of providing "quality healthcare." The Fuzzy Panda Report itemizes the Company's mission-critical failure to satisfy key healthcare requirements. These oversight failures include: management turning a "'blind eye' to cheating on certification tests", DocGo's nurses "coaching financially struggling patients on how to get nurses to administer excessive Covid-19 vaccines to them in order to receive multiple $100 gift cards", and a whistleblower report from a New York City nurse revealing that the Company covered up that its nurses had given children "dangerous and improper" Covid vaccines. On this news, DocGo's stock price fell from a closing price of $4.79 per share on January 9, 2024 to a closing price of $2.99 per share on January 10, 2024—a 37.58% decrease.

**<u>SHARE REPURCHASES</u>**

119. While engaging in the foregoing misconduct, issuing the above-described false and misleading statements, and concealing the truth from the market (as discussed *supra*), the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing significant harm to the Company.

120. Indeed, in May 2022, the Company's Board approved a share repurchase program to purchase up to $40 million of the Company's common stock. Following this, the Individual Defendants caused the Company to repurchase its shares under this repurchase program, as follows:

| Date | Number of Shares Repurchased | Avg. Price per Share ($) | Total Cost to the Company ($)[2] | Total Overpayment ($)[3] |
|---|---|---|---|---|
| May 2022 | 30,000 | 6.96 | 208,800.00 | 119,100.00 |
| June 2022 | 40,000 | 7.23 | 289,200.00 | 169,600.00 |
| November 2022 | 193,927 | 6.88 | 1,334,217.76 | 754,376.03 |
| December 2022 | 272,912 | 7.10 | 1,937,675.20 | 1,121,668.32 |
| **TOTAL** | **536,839** | **--** | **3,769,892.96** | **2,164,744.35** |

121. Accordingly, the Individual Defendants caused the Company to engage in harmful share repurchases while simultaneously engaging in the foregoing misconduct and issuing false and misleading statements to the market, causing the Company's share price to be artificially inflated. Had the Company's share price not been artificially inflated then these repurchases would have cost the Company $1,605,148.61. However, as a direct and proximate result of the Individual

2 "Total Cost to the Company" refers to the amount the Company paid for its own common stock.

3 "Total Overpayment" refers to the amount that the Company overpaid for its common stock and is calculated by working out what the Company should have paid for its stock had it not been artificially inflated (*i.e.*, $2.99, as it was when the truth was revealed in January 2024) and subtracting that amount from what the Company actually paid.

Defendants' unlawful and disloyal conduct, the Company was forced to pay $3,769,892.96 for those shares – an overpayment of over $2.1 million.

## INSIDER TRADING

122. Rather than providing the market with correct information, the Insider Trading Defendants used their knowledge of DocGo's material, non-public information to sell over 434,000 shares of their personal holdings for collective proceeds of over $4 million while the Company's stock was artificially inflated. As officers and directors of DocGo, the Insider Trading Defendants were privy to material, nonpublic information about Capone's educational background and also the Company's operations and prospects, particularly as it related to the HPD Contract.

123. While in possession of this material, non-public knowledge, Defendant Bienstock sold 19,197 shares of his personally held DocGo stock for approximately $166,342.33 in proceeds. His sales were timed to maximize profit from DocGo's then artificially inflated stock price.

124. While in possession of this material, non-public knowledge, Defendant Capone sold 22,400 shares of his personally held DocGo stock for approximately $219,450.00 in proceeds. His sales were timed to maximize profit from DocGo's then artificially inflated stock price.

125. While in possession of this material, non-public knowledge, Defendant Oberholzer sold 259,058 shares of his personally held DocGo stock for approximately $2,495,110.89 in proceeds. His sales were timed to maximize profit from DocGo's then artificially inflated stock price.

126. While in possession of this material, non-public knowledge, Defendant Tendler sold 10,000 shares of his personally held DocGo stock for approximately $87,500 in proceeds. His sales were timed to maximize profit from DocGo's then artificially inflated stock price.

127. While in possession of this material, non-public knowledge, Defendant Travers sold 125,000 shares of his personally held DocGo stock for approximately $1,066,150.00 in proceeds. His sales were timed to maximize profit from DocGo's then artificially inflated stock price.

## DAMAGE TO THE COMPANY

### Securities Class Action

128. On October 27, 2023, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Naclerio v. DocGo Inc., et al.*, 1:23-cv-009476-KPF (S.D.N.Y.) (the "Securities Class Action").

129. On March 28, 2025, the Court granted in part and denied in part the defendants' motion to dismiss the Securities Class Action. In upholding the claims regarding Capone's educational background, the Court found that "[t]he nature of Capone's statements went beyond mere embellishment of his resume; instead, the Amended Complaint alleges that Capone incorporated the misstatements into his pitch about his ability to guide DocGo's technological development in line with emerging trends in the industry."[4] Further, with respect to the Company's prospects and operations, the Court held, *inter alia*, that the plaintiff's allegations "provided sufficient support to allow a finding that Capone's statements regarding the value of the CBP contract were false or misleading when made[,]" and that these "statements are not protected under the PSLRA's safe harbor provision."[5]

---

[4] Securities Class Action, ECF No. 77, at 24.

[5] *Id.*, at 26-27.

130. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers through substantive litigation.

**Unjust Compensation**

131. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

132. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

133. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

134. As alleged above, while engaging in and/or permitting the misconduct as alleged above, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices. As a result, the Company overpaid for its common stock by over $2.1 million, thus causing significant harm to the Company.

**Insider Trading**

135. As alleged above, the Insider Selling Defendants, while in possession of material, non-public information, collectively abused their positions as Company insiders, misappropriated the Company's valuable information, and reaped over $4 million in gross proceeds through their unlawful insider trading which the Company is entitled to disgorge

**Departure of Defendant Capone**

136. As alleged above, on September 15, 2023, DocGo filed a Current Report on Form 8-K with the SEC, announcing Capone's "resignation."

137. Defendant Capone held a high-ranking executive role within DocGo, and filling this role will have required the Company to expend significant amounts. As is commonly reported, the cost of replacing C-suite executives can be costly for a company.[6] Thus, the Company having to replace Defendant Capone as a result of the wrongful conduct, and as a result of the Individual Defendants not having investigated Capone's background prior to his appointment as CEO, will undoubtedly have cost the Company substantial amounts.

**Additional Damage to the Company**

138. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

139. The Company will also suffer losses in relation to the Individual Defendants'

[6] *See e.g.*, *The Quiet (and Expensive) Cost of Poor C-Suite Retention*, Stanton Chase (Aug. 2022), https://www.stantonchase.com/insights/white-papers/the-quiet-and-expensive-cost-of-poor-c-suite-retention-2; *CEO Selection: The Costs of Getting it Wrong*, Spencer Stuart (May 2016), https://www.spencerstuart.com/research-and-insight/ceo-selection---the-costs-of-getting-it-wrong; *How Much Does Replacing an Employee Cost?*, BOS (2019), https://www.bos.com/inspired/how-much-does-replacing-an-employee-cost/.

failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

140. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

141. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

142. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

143. At all relevant times, the Company had in place its Code of Conduct and Ethics ("Code of Conduct"). The Code of Conduct states the following:

> We are proud of what the Company has accomplished to date, and your commitment to continued excellence is crucial as our Company changes and grows. We expect all individuals associated with the Company to conduct themselves with the highest degree of honesty and integrity at all times.
>
> * * *
>
> We consider any violation of this Code to be a serious breach of our 17 trust, and any violation will result in disciplinary action, up to and including termination, as well as potential civil or criminal penalties, depending on the nature of the violation

and applicable law. Similarly, if you are aware of someone's violation of this Code, you have a duty to report the violation in accordance with the procedure detailed below. We depend on your commitment to protect our culture and values and will view your reporting of violations in that context.

144. In a section entitled "Fair Dealing," the Code of Conduct states the following:

> You are expected to be honest, ethical and fair and should endeavor to deal fairly with customers, vendors, suppliers, business partners, service providers, competitors and employees. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

145. In a section entitled "Legal Compliance," the Code of Conduct states:

> The Company conducts its affairs consistent with the applicable laws and regulations of the United States and the states and foreign jurisdictions in which it does business, and adherence to all legal and regulatory requirements is among our highest priorities. As a Company director or employee, you are expected to comply with all such applicable laws and regulations.

146. In a section entitled "Company Disclosure Obligations," the Code of Conduct provides the following:

> The Company's business affairs are also subject to certain internal and external disclosure obligations and record-keeping procedures. As a public company, we are committed to abiding by our disclosure obligations in a full, fair, accurate, timely and understandable manner. Only with reliable records and clear disclosure procedures can we make informed and responsible business decisions. When disclosing information to the public, it is our policy to provide consistent and accurate information. To maintain consistency and accuracy, specific Company spokespersons are designated to respond to questions from the public. Only these individuals are authorized to release information to the public at appropriate times. All inquiries from the media or investors should be forwarded immediately to the GC or CFO. The GC or the CFO must approve all press releases, speeches, publications or other official Company disclosures in advance. For further discussion on our policies with respect to communications with the investment community please review our Guidelines for Public Disclosures and Communications with the Investment Community.
>
> Our internal control procedures are further regulated by the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). The Sarbanes-Oxley Act was a U.S. legislative response to events at public companies involving pervasive breakdowns in corporate ethics and internal controls over financial reporting. It was designed to rebuild confidence in the capital markets by ensuring that public companies are

> operated in a transparent and honest manner. Ensuring proper and effective internal controls is among the Company's highest priorities.
>
> We take seriously the reliance our investors place on us to provide accurate and timely information about our business. In support of our disclosure obligations, it is our policy to always:
>
> • comply with generally accepted accounting principles;
>
> • maintain a system of internal accounting and disclosure controls and procedures that provides management with reasonable assurances that transactions are properly recorded and that material information is made known to management;
>
> • maintain books and records that accurately and fairly reflect transactions; and
>
> • prohibit establishment of material undisclosed or unrecorded funds or assets.

**<u>Audit Committee Charter</u>**

147. In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Katz (chair), Burdiek, and Smedra owed specific additional duties to DocGo. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparation and certification of the Company's financial statements to guarantee the independent auditors' report, or to guarantee other disclosures by the Company, among other things:

> 2. Purpose, Duties, and Responsibilities. The purpose of the Committee, at a minimum, must be to:
>
> • represent and act on behalf of the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with ethical, legal and regulatory requirements; (c) the outside auditor's qualifications and independence and (d) the performance of the Company's internal audit function and outside auditor; and

• oversee the preparation of the report of the Committee required by the SEC Rules to be included in the Company's annual proxy statement.

Among its specific duties and responsibilities, the Committee will:

***

[] Receive reports from the outside auditor and management regarding, and review and discuss the adequacy and effectiveness of, the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Committee by the outside auditor or management.

[] Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

[] Review and discuss with the principal internal auditor of the Company: (1) the annual audit plan and the adequacy of the internal audit resources and (2) the results of the internal audit program.

***

[] Review and discuss earnings press releases and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

[] Review and discuss the Company's practices with respect to risk assessment and risk management, and risks related to matters including the Company's financial statements and financial reporting processes, compliance, and information technology and cybersecurity.

[] Oversee the Company's Compliance Program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and policies and procedures for monitoring compliance; and , meet to review the implementation and effectiveness of the Company's Compliance Program with the Chief Compliance Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

[] Establish and oversee procedures for handling reports of potential misconduct, including: (1) violations of law or the Company's code(s) of conduct; (2) complaints regarding accounting, internal accounting controls, auditing and federal securities law matters; and (3) the confidential, anonymous submission of concerns by employees regarding accounting, internal accounting controls, auditing and federal securities law matters.

> [] Establish and periodically review policies and procedures for the review, approval and ratification of related person transactions (as defined in applicable SEC Rules), review related person transactions, and oversee other related party transactions governed by applicable accounting standards.
>
> [] Establish policies for the hiring of employees and former employees of the outside auditor.
>
> ***
>
> [] Annually evaluate the performance of the Committee and the adequacy of the Committee charter and recommend changes to the Board as appropriate.

## DUTIES OF THE DIRECTOR DEFENDANTS

148. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

149. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

150. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

151. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

152. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or

practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

153. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

154. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**DERIVATIVE AND DEMAND REFUSED ALLEGATIONS**

155. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of

corporate assets, and other wrongful conduct as alleged herein.

156. Plaintiff is a current stockholder of DocGo and has owned DocGo stock at all relevant times hereto. Plaintiff understands his obligation to hold DocGo stock throughout the pendency of this action and is prepared to do so.

157. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

158. Following the alleged misconduct and damage, on July 18, 2025, Plaintiff made a demand on the Board to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants – to recover, for the benefit of the Company, the damage caused to it. Attached hereto as **Exhibit A** is a true and correct copy of the Demand.

159. To date, the Board has not responded or even informed Plaintiff that the Demand is being considered by the Board. This inaction constitutes a willful and wrongful refusal of the Demand.

160. The Board has been on notice of the wrongdoing alleged herein since at least the commencement of the Securities Class Action, filed in October 2023, if not from the beginning of the wrongdoing alleged herein.[7] As a result of the wrongdoing alleged herein, the Company has suffered significant harms and continues to suffer significant harms from its defective internal controls and exposure to legal and business risk, which the Board have been further made aware of as a result of the denial of the motion to dismiss in the Securities Class Action. However, to

[7] Furthermore, Plaintiff served an inspection demand pursuant to 8 *Del. C.* § 220 on the Company on April 1, 2025. As such, the Board has been aware of Plaintiff's investigation of the underlying misconduct and these allegations since at least then.

date, the Board has failed to take any action on behalf of the Company

161. Because the Individual Defendants plausibly knew about the wrongdoing alleged herein, the Board ignoring Plaintiff's Demand and failing to take any action to remedy the harms alleged herein constitutes a wrongful refusal of the Demand which will irreparably prejudice the Company and its claims because, among other things, the wrongs complained of in the Demand remain uncorrected and the Company will suffer additional ongoing damage as a result.

162. In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's refusal cannot be reasonably interpreted as being in the best interests of the Company or the product of prudent business judgment.[8]

163. Accordingly, the Board's response here is an unreasonable and wrongful refusal of Plaintiff's Demand to initiate an action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in DocGo's favor and should be permitted to proceed with this derivative action.

## CLAIMS FOR RELIEF

## COUNT ONE

## (Against the Individual Defendants for Breach of Fiduciary Duties)

164. Plaintiff incorporates by reference and re-allege each and every allegation

---

[8] It is also plausible that the Board, aware that (i) other related actions asserting demand futility may be dismissed for failing to make a demand, and (ii) the statute of limitations period would soon expire, are ignoring Plaintiff's demand so they will not have to investigate and commence an action against themselves for the alleged wrongdoing. Such action would most certainly not be in the Company's best interests, nor would it constitute a good faith exercise of the Board's business judgment.

contained above, as though fully set forth herein.

165. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

166. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry and good faith.

167. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its prospects and operations, as well as Capone's educational background. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168. In breach of their fiduciary duties owed to DocGo, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (i) Capone did not hold a graduate degree in computational learning theory from Clarkson University (or any other university) and had fabricated his educational credentials; and (ii) Capone's educational background was material to investors; (iii) DocGo did not enroll anyone, including asylum seekers, in New York State Medicaid programs, as the Company later admitted; (iv) DocGo did not have a contract with UnitedHealthcare in New York and did not have the ability to enroll asylum seekers in United Healthcare's managed care program, as DocGo later admitted; and (v) DocGo's ability to grow its payer vertical was material to the Company's future growth and earnings. As a result of the foregoing, DocGo's public statements were materially false and misleading at all relevant times.

169. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**COUNT TWO**

**(Against the Individual Defendants for Gross Mismanagement)**

170. Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

171. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

172. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

173. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**COUNT THREE**

**(Against the Individual Defendants for Waste of Corporate Assets)**

174. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175. The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

176. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) repurchasing millions of dollars' worth of the Company's stock while the stock price was artificially inflated.

177. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**COUNT FOUR**

**(Against the Individual Defendants for Unjust Enrichment)**

178. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

180. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

181. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from

insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**COUNT FIVE**

**(Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act)**

182. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183. The Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

184. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DocGo, their control over, and/or receipt and/or modification of DocGo's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning DocGo, participated in the fraudulent scheme alleged herein.

185. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.

The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

186. The Individual Defendants were each members of DocGo's Board of Directors and senior management team during the aforesaid time period. Based on their roles at DocGo, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

187. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at DocGo, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

188. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

189. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

190. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company

**COUNT SIX**

**(Against the Insider Trading Defendants for Insider Trading)**

191. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192. By reason of their fiduciary roles as officers and directors of the Company, the Insider Trading Defendants specifically owed the Company the highest obligation of due care, good faith, and loyalty.

193. As officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

194. When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above, and sold Company stock on the basis of such information for collective gross proceeds in excess of $4 million.

195. The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated for their own benefit when they sold holdings in Company stock. The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

196. As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C. Awarding, against all the Insider Trading Defendants and in favor of the Company, disgorgement of all unlawfully obtained proceeds from their insider trading;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 19, 2025

**GAINEY McKENNA & EGLESTON**

______________________________
Gregory M. Egleston
Thomas J. McKenna
Christopher M. Brain
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com
Email: cbrain@gme-law.com

***Attorneys for Plaintiff***